### CANTRADE PRIVATE BANK LAUSANNE LTD., Plaintiff,

v.

### Maria S. TORRESY a/k/a Mary S., Torresy, Defendant.

### No. 93 Civ. 3526 (PKL).

United States District Court, S.D. New York.

Feb. 27, 1995.

---

Cadwalader, Wickersham & Taft, New York City (Earl H. Nemser, Gary J. Mennitt, of counsel), for plaintiff.

Robinson Silverman Pearce Aronsohn & Berman, New York City (Robert A. Wolf, Carey Wagner, of counsel), for defendant.

## OPINION AND ORDER

LEISURE, District Judge:

This is an action brought by Cantrade Private Bank Lausanne Ltd. ("Cantrade") against Maria S. Torresy, a/k/a Mary S. Torresy ("Torresy"), seeking payments allegedly due on three loans made to corporations controlled by Torresy. Plaintiff asserts that defendant personally guaranteed repayment and granted a security interest in cooperative apartments owned by her. Plaintiff now moves for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order holding Torresy liable for payment on the three outstanding loans and dismissing Torresy's affirmative defenses and counterclaims. Defendant, in turn, moves for summary judgment dismissing all but one of plaintiff's claims for relief and for partial summary judgment on her counterclaim. For the reasons stated below, plaintiff's motion is granted in part and denied in part and defendant's motion is also granted in part and denied in part.

### BACKGROUND

Plaintiff Cantrade is a Swiss banking corporation with its principal offices in Lausanne, Switzerland. Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ("Plaintiff Mem.") at 2. Defendant Torresy resides at 322 East 57th Street, New York, New York, a Sutton Place cooperative apartment building where she owned two apartments: a duplex apartment (the

"Duplex") and a triplex apartment (the "Triplex"). *Id.* Cantrade has asserted several claims against Torresy in connection with several different loan transactions.

In 1984 and 1985, Chemical Bank loaned $1,000,000 to a company called Mafra, Inc. (the "Mafra Loan"). *Id.* The principals of Mafra, Inc. ("Mafra"), Torresy and her husband Frank Torresy, both signed unconditional guaranties for this loan and gave a first lien against the Duplex. *Id.* at 3. In 1988, Chemical Bank transferred all of its right, title and interest in and to the Mafra loan and to Torresy's Mafra guaranty to Cantrade. *Id.* Mafra failed to pay the remaining principal balance on the Mafra loan, $738,696, when it became due on April 12, 1991. *Id.* Cantrade sold Torresy's interest in the Duplex at an auction to a corporate affiliate, Cantrade 57th Street, Inc., for $900,000. *Id.* at 4.

The Mafra Loan funds were used to capitalize a glass company called Empire Glass, Inc. ("Empire Glass") of which Torresy was president. Plaintiff Mem. at 4. In 1989, Empire Glass became involved in litigation with Tamglass, Inc. ("Tamglass"), and in settlement of that litigation, Tamglass reduced the amount of Empire Glass's debt to $1,000,000 and accepted a new note and letter or credit for that amount. *Id.* at 4–5. The $1,000,000 letter of credit (the "Letter of Credit") was issued by Cantrade and secured Empire Glass's debt to Tamglass. *Id.* at 5. Plaintiff alleges that Torresy promised to file a mortgage against the Triplex as security for the Letter of Credit. *Id.* at 5–6. On June 16, 1992, upon default by Empire Glass of its obligations under the settlement agreement with Tamglass, Tamglass drew down the full amount of the Letter of Credit plus interest accrued to that date, $1,010,082. *Id.* at 6–7.

On February 8, 1991, Torresy, as president of Empire Glass, executed a promissory note (the "Promissory Note") evidencing a loan made by Cantrade to Empire Glass in the amount of $250,000. Plaintiff Mem. at 7. This loan was secured by an endorsement on the Promissory Note, signed by Torresy in favor of Cantrade. *Id.* It is conceded that Empire Glass failed to pay the principal balance of the Promissory Note when it became due and payable. *Id.*

## DISCUSSION

### I.  *The Standard for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2522, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991). Summary judgment "is appropriate only 'after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Thornton v. Syracuse Sav. Bank,* 961 F.2d 1042, 1046 (2d Cir.1992) (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552); *accord Irvin Indus., Inc. v. Goodyear Aerospace Corp.,* 974 F.2d 241, 245 (2d Cir.1992).

"In deciding whether to grant summary judgment all inferences drawn from the materials submitted to the trial court are viewed in a light most favorable to the party opposing the motion. The nonmovant's allegations are taken as true and it receives the benefit of the doubt when its assertions conflict with those of the movant." *Cruden v. Bank of New York,* 957 F.2d 961, 975 (2d Cir.1992). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Id.; accord Taggart v. Time, Inc.,* 924 F.2d 43, 46 (2d Cir.1991); *see also Lang,* 949 F.2d at 580 ("In determining how a reasonable jury would decide, the court must resolve all ambiguities and draw all inferences against the moving party."); *Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991) ("Viewing the evidence produced in the light

most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate.").

The substantive law governing the case will identify those facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.*, 477 U.S. at 249, 106 S.Ct. at 2511.

■ The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and identifying which materials "it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. Once a motion for summary judgment properly is made, however, the burden then shifts to the nonmoving party, which " 'must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511 (quoting Fed.R.Civ.P. 56(e)); *accord Brass v. American Film Technologies, Inc.*, 987 F.2d 142 (2d Cir.1993). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2509–10 (emphasis in original). "Conclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.' " *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990) (quoting *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106

S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)), *cert. denied*, 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991). "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) (citations and quotation omitted); *see also Gnazzo v. G.D. Searle & Co.*, 973 F.2d 136, 138 (2d Cir.1992) (the court must "consider the record in the light most favorable to the non-movant. However, the non-movant may not rest upon the mere allegations or denials of [her] pleading, but must set forth specific facts showing that there is a genuine issue for trial.") (quotation and citations omitted). The Court draws all reasonable inferences in favor of the nonmoving party only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987).

## II. *The Mafra Loan*

There is no dispute as to the validity of Torresy's guarantee of the Mafra Loan, Cantrade's lien against the Duplex, or Cantrade's security interest in the Duplex. It is also undisputed that Torresy defaulted on the Mafra Loan and that Cantrade provided written notice of the default to Torresy. Section 9–504(1) of the New York Uniform Commercial Code (McKinney 1990 and Supp. 1994) ("UCC") provides that after a default, a secured party may "sell, lease, or otherwise dispose of any or all collateral." Torresy does not contest Cantrade's right to sell the Duplex. Cantrade sent notification of the sale of the Duplex both to Torresy and to her attorney.[1] Plaintiff Mem. at 10. Moreover, her attorney was present at the auction. *Id.* at 11.

The principal disagreement between Cantrade and Torresy concerns the commercial reasonableness of the auction. Torresy contends that the fair market value of the Du-

---

1. Cantrade caused the Duplex to be sold at a foreclosure sale, at which sale, an affiliate of Cantrade was the successful bidder for $900,000.

Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Defendant Mem.") at 8.

plex, at the time of the foreclosure sale, was between $1,300,000 and $1,500,000. Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Defendant Mem.") at 8. It is Torresy's position that Cantrade did not engage in a commercially reasonable marketing effort in connection with the foreclosure sale, as required under UCC § 9–504. Torresy maintains that she is entitled to the amount by which the fair market value of the Duplex exceeded the remaining debt under the Mafra Loan. At a minimum, Torresy argues, she should receive the amount by which the remaining debt on the Mafra loan was exceeded by the sum actually paid for the Duplex. This money, she contends, should be applied to offset the amount owed to Cantrade on the other loans.

## A. Commercial Reasonableness of Sale

■ Defendant does not contest the fact that plaintiff imparted notice of the foreclosure sale to her. Instead, Torresy maintains that Cantrade cannot establish the commercial reasonableness of "every aspect of the disposition including the method, manner, time, place and terms." See Reply Memorandum of Law of Defendant Maria S. Torresy in Further Support of her Motion for Summary Judgment and Related Relief ("Defendant Reply") at 15 (quoting UCC § 9–504(3)).

Torresy argues that particularly close scrutiny of the sale is mandated in the instant case because (1) there is a large discrepancy between the sale price and the fair market value of the Duplex; and (2) an affiliate of Cantrade purchased the Duplex. Torresy maintains that the foreclosure sale was unreasonable because (1) Cantrade failed to make arrangements to afford interested parties an opportunity to view the Duplex prior to the foreclosure sale; and (2) Cantrade has not shown that it made any attempt to target its pre-sale marketing and advertising efforts at those who could afford and would be interested in the Duplex.

Cantrade contends that the disposition of the Duplex was commercially reasonable. It notes that it hired a licensed auctioneer who conducted a public auction of the Duplex. Plaintiff Mem. at 12. It further observes that it advertised the sale of the Duplex in both the Wall Street Journal and in the New York Times. The advertisement was only published once in the Wall Street Journal, but it ran for three consecutive weeks in the New York Times. Id. Cantrade also points out that no fewer than seventeen parties attended the auction and that there was active bidding among at least four of those in attendance. Id. at 13. Cantrade further argues that Torresy has presented no admissible evidence demonstrating that the Duplex was sold for less than its fair market value. See Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff Opp.") at 3. Moreover, asserts Cantrade, the UCC clearly provides that price alone cannot render unreasonable an otherwise commercially reasonable sale.[2]

Cantrade also notes that (1) Torresy was on the cooperative corporation's board of directors at the time of the foreclosure, (2) Cantrade requested that the Duplex be shown to prospective buyers prior to the auction; and (3) the cooperative corporation's board of directors denied access to the apartment. In addition, continues Cantrade, there is no legal requirement that a secured creditor arrange for potential purchasers to view collateral prior to a foreclosure sale. As a result, Cantrade concludes, the circumstances of the auction preclude any claim that sale of the Duplex was not commercially reasonable.

This Court finds that the sale of the Duplex was commercially reasonable. Cantrade provided Torresy with reasonable notification of the sale of the Duplex, and Torresy's attorney was present at the auction. The auction was public and was conducted by a professional auctioneer. In addition, the sale

---

2. Section 9–507(2) of the UCC provides in pertinent part:

The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to estab-

lish that the sale was not made in a commercially reasonable manner. If the secured party ... has otherwise sold [the collateral] in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner.

was advertised in both the Wall Street Journal and the New York Times. Moreover, there were seventeen parties in attendance at the auction, and at least four of those present actively bid for the Duplex.

Consequently, after close scrutiny, this Court concludes that the sale was commercially reasonable.

### B. *Fair Market Value versus the Actual Amount Paid*

■ A commercially reasonable sale of collateral determines the amount to which a UCC debtor is entitled. *See* UCC § 9–504(2); *Paco Corp. v. Vigliarola,* 611 F.Supp. 923, 926 (E.D.N.Y.1985), *aff'd,* 835 F.2d 1429 (2d Cir.1987). This Court, having found that the sale of the Duplex was commercially reasonable, finds that the amount owed to Torresy was the purchase price of the Duplex and not the fair market value of the Duplex, as propounded by defendant. As a result, Torresy is entitled to the difference between the final sale price of the Duplex and the amount of the debt remaining on the Mafra loan.[3]

### C. *Offset*

Torresy also argues that she is entitled to the profits retained by Cantrade from subrental income that the bank collected from the subtenants of the Duplex prior to the time the bank formally took title to the Duplex. Defendant contends that she is entitled to subrent income generated for the sixteen month period between the time of the foreclosure sale in November 1992 and Cantrade's closing of title to the apartment in March 1994. *See* Defendant Mem. at 12. Defendant asserts that, during this period, she was still the record co-owner and sublessor of the Duplex and consequently entitled to the subrent income. Torresy claims that she is entitled to set off, against any liability she may have to Cantrade, the amount of profit realized by Cantrade from its allegedly improper collection of subtenant rent from the foreclosed apartment prior to taking title.

Torresy notes that the collateral that was sold was cooperative shares and a proprietary lease allocated to a particular unit in a cooperatively owned apartment building. *See* Defendant Reply at 20. Torresy argues that there was a recognition agreement that, in conjunction with the proprietary lease, precluded transfer of the shares and lease, even to a foreclosing lender like Cantrade, subject to the written approval of the apartment corporation's board of directors. Accordingly, concludes defendant, the transfer of the Duplex did not take place until the board gave written consent to such transfer on March 22, 1994.

Cantrade, in turn, contends that defendant's claim of entitlement to the subrents collected after the auction sale of the Duplex is incorrect. Plaintiff Opp. at 7. Cantrade argues that after Torresy's default on the Mafra Loan, it had the statutory right to "sell, lease or otherwise dispose of the collateral." UCC § 9–504(1). As a consequence, Cantrade claims, defendant's right to collect rents terminated. Plaintiff maintains that, as of the date of the auction, all of Torresy's rights in the Duplex were transferred to the buyer, Cantrade 57th Street, Inc, and the buyer had the right to collect rent and pay monthly maintenance and sublet fees.

■ Although restrictions on the transfers of shares subject to a recognition agreement may limit a secured party's ability to dispose of collateral after foreclosure, this does not mean that defendant is entitled to subrents collected after the auction but before board approval was granted. Such restrictions typically afford the board an opportunity to buy back the property upon which there has been a default. In fact, defendant cites *Bank of New York v. Carr,* 161 Misc.2d 332, 333, 613 N.Y.S.2d 572, 573 (Sup.Ct.1994) for the proposition that the "restrictions on the transfer of a proprietary lease and stock as contained in a cooperative corporation's bylaws and occupancy agreement are enforceable." "Plaintiff's security interest is . . . subject to the option rights of the coop-

---

3. Cantrade contends, and Torresy does not dispute, that the amount due on the Mafra Loan on November 13, 1992, the date of the auction, was $805,680. The sale price was $900,000. This leaves a surplus of $94,320 which, when an interest rate of 9% is applied, creates a total credit of $99,668. *See* Plaintiff Mem. at 14.

erative corporation ... and, in enforcing its security interest, *may transfer to a purchaser no more than the debtor's rights in the collateral."* Id. at 372–73, 613 N.Y.S.2d 572 (emphasis added).

It is clear that although Cantrade's ability to transfer the Duplex may have been restricted, it was permitted to transfer any of Torresy's rights. To the extent that a restriction existed, it was in regard to the corporation's board of directors and not with respect to defendant. Torresy, the defaulting party, cannot claim entitlement to income derived from property, which was rightly seized as security for the debt upon which she defaulted, simply because Cantrade is restricted as to how it may dispose of the property. The rights of Torresy, the debtor, are inferior to those of Cantrade, the secured creditor. Therefore, none of the subrents collected accrue to the benefit of the debtor.

In sum, although Cantrade may have been restricted as to how it could dispose of the Duplex, the subrents collected during the time prior to the satisfaction of those obligations did not accrue to the benefit of Torresy. Rather, as of the date of the auction, all of Torresy's rights in the Duplex redounded to the benefit of Cantrade.

### D. *Conclusion*

For the reasons stated above, Torresy is entitled to an offset of the difference between the amount due on the Mafra Loan on the date of the auction, $805,680, and the sale price, $900,000. The surplus is $94,320 which, when an interest rate of 9% is applied, results in a total credit of $99,668. Torresy is not entitled to the fair market value of the Duplex, as opposed to the sale price, because the sale was commercially reasonable. Torresy is also not entitled to the profits retained by Cantrade from subrental income that the bank collected from the subtenants of the Duplex prior to the time the bank formally took title to the Duplex. In sum, although Cantrade's first claim for relief

must fail because no sums are due and owing from Torresy to Cantrade under the Mafra Guaranty of the Mafra Loan, Torresy is only entitled to the surplus obtained in the sale of the Duplex. This is the excess of the value realized by Cantrade upon the sale of the Duplex over the amount of the indebtedness due under the Mafra Loan at the time of the sale.

█ Finally, defendant, in one paragraph in her final set of papers, questions whether plaintiff's calculations are correct. *See* Defendant Reply at 13. This Court finds such an eleventh hour assertion, unsupported by any factual allegation, insufficient to raise a material issue of fact.

### III. *The Letter of Credit*

Cantrade contends that the Letter of Credit issued to Empire Glass effectively freed Torresy from her personal liability to Tamglass on a debt of more than $1,000,000. *See* Plaintiff Mem. at 5. Cantrade argues that on May 23, 1990, only a week before Cantrade issued the Letter of Credit, Torresy wrote a letter to a Cantrade officer, Rene DiPicciotto, that reads as follows:

> Dear Rene: As per your request I hereby confirm that upon your first demand I will file a first mortgage as collateral for the envisaged credit line of U.S. $2,000,000.00 against the following properties at: 322 East 57th Street, New York, NY 10022.
>
> Size: 9,000 square feet
>
> Valued: U.S. $6,000,000.00 free and clear of any mortgage
>
> These properties are of prime quality located in one of the ten most prestigious buildings in New York.
>
> You have presently as collateral a property appraised at U.S. $1,800,000.00 also located at the same address.

Complaint, ex. G.

Cantrade maintains that the May 23, 1990 letter (the "Letter") clearly states a promise by Torresy to file a mortgage[4] against the

---

4. Cantrade notes that the letter should technically have spoken of a lien against the cooperative lease and shares, and not a "mortgage." Plaintiff Mem. at 6 n. 1. Torresy seizes upon the improper language as a further ambiguity in the

Letter demonstrating the non-binding nature of the Letter. *See* Plaintiff Mem. at 16. Although this Court finds the Letter too ambiguous to support a motion for summary judgment, the improper use of "mortgage" rather than "lien" is

Triplex and that the Letter acknowledges the existing lien against the Duplex. Cantrade maintains that the Letter is an enforceable security agreement assigning the Triplex as collateral.

■ Attachment of a nonpossessory security interest in collateral requires four elements: (1) value has been given; (2) the debtor has rights in the collateral; (3) the debtor has signed a security agreement; (4) the security agreement contains a description of the collateral. *See* UCC § 9–203.

A. *Value*

■ Cantrade argues that it issued its $1,000,000 Letter of Credit within a week after the Letter was written, and that the Letter of Credit satisfied an obligation that Torresy had personally guaranteed. Cantrade concludes that Torresy received value as a matter of law. Torresy contends that, if the Letter is a security agreement, the specific value that Cantrade was obligated to furnish was, in fact, never transferred. Specifically, Cantrade maintains that the Letter, the purported security agreement, contemplates a $2,000,000 credit line. Torresy argues that Cantrade only extended a $1,000,000 Letter of Credit.

While it may be the case that no effective security agreement was entered into between Cantrade and Torresy or that the security agreement did not grant Cantrade a security interest in the Triplex, this Court finds that Cantrade's $1,000,000 Letter of Credit indisputably constitutes value. The Court concludes, therefore, that value was given to the debtor, Torresy.[5]

B. *Rights*

There is no dispute that Torresy had rights in the Triplex.

C. *Security Agreement*

■ Cantrade cites a Kentucky case for the proposition that

only a small part of the overall ambiguity of the Letter.

no magic words need be included in any security agreement to establish a valid security interest. Rather, the language of the instrument need only 'lead to the logical conclusion that it was the intention of the parties that a security interest be created.'

*In re Owensboro Canning Co.*, 82 B.R. 450, 455 (W.D.Ky.1988) (citations omitted). This Court finds, however, that even if it were to employ the test espoused by Cantrade, the issue of Torresy's intent is one of fact. The Letter is sufficiently ambiguous to preclude a finding, as a matter of law, that Torresy intended the Letter to serve as a security agreement.

Cantrade argues that Torresy's promise, in the Letter, to "file a first mortgage" "upon [Cantrade's] first demand" constitutes a valid security agreement that attached, at the latest, upon Cantrade's filing of the instant lawsuit. Cantrade maintains that Torresy's phrase, "I will file a first mortgage," clearly shows intent, and that the Letter of Credit was an unambiguous conferral of value. Cantrade contends that the terms of the Letter are not too conditional to evidence an intent to create a security interest.

■ Torresy argues that the Letter was never intended to, and never did, create a security interest in the Triplex. Article 9 of the UCC applies to transactions which are "intended to create a security interest." UCC § 9–102(1)(a). The intent of a debtor to grant and a creditor to obtain a secured interest in specific property must be clearly expressed to create an enforceable security agreement. *See In re OPM Leasing Services, Inc.*, 46 B.R. 661, 669 (Bankr.S.D.N.Y. 1985).

■ Defendant claims that the conditional language in the Letter evidences a lack of intent. For example, the Letter states that a first mortgage would be filed as demanded as collateral for the "envisaged" credit line of $2,000,000. Torresy maintains that this language merely expresses a future possibility. Torresy buttresses her argu-

**5.** There is a separate question as to the terms of the purported security agreement, and as to whether those terms were met.

ment with the assertion that the "envisaged" $2 million credit line was never extended by Cantrade to Empire Glass.[6] She concludes that the Letter contains no words from which it can be understood that she had a present, unconditional intent to grant a security interest in the Triplex as consideration for Cantrade's issuance of the Letter of Credit.[7]

▌ Finally, Cantrade also argues that defendant cannot introduce evidence to show that the Letter did not indicate an intent to create a security interest because New York courts, noting the strong public interest in the integrity of banking records, have consistently barred evidence which suggests that parties to an instrument agreed that it not be enforced against a bank.

> When [a party] execute[s] and deliver[s] to the plaintiff bank an instrument in the form of a note, [that party is] chargeable with knowledge that, for the accommodation of the bank, [she] was aiding the bank to conceal the actual transaction. Public policy requires that a person who, *for the accommodation of the bank* executes an instrument *which is in form a binding obligation,* should be estopped from thereafter asserting that simultaneously the parties agreed that the instrument should not be enforced.

*Mount Vernon Trust Co. v. Bergoff,* 272 N.Y. 192, 196, 5 N.E.2d 196, 197 (1936) (emphasis added).

*Bergoff,* however, is inapposite in the instant situation. The very question that needs to be answered is whether defendant entered into a binding obligation. Torresy is not asserting that the parties agreed that the instrument should not be enforced. Rather, she is contending that there never was a binding agreement. In fact, the existence of the purported security agreement can only be ascertained subsequent to a determination

of the intent of the parties. In other words, Cantrade is arguing that evidence which is relevant to whether or not an alleged security agreement is binding should be excluded by a rule that only applies to binding agreements.

Moreover, even if an agreement is ultimately found, it certainly was not entered into for the "accommodation of the bank." Accordingly, Torresy is not precluded from introducing evidence demonstrating that she neither intended for the Letter to serve as a security agreement nor did she intend to grant a security interest in the Triplex.

▌ In addition, because this Court finds the Letter to be ambiguous, Torresy is permitted to introduce parol evidence to clarify the terms of any agreement or to prove that there, in fact, never was an agreement. *See Geller v. Esikoff,* 165 A.D.2d 863, 560 N.Y.S.2d 328, 330 (2d Dep't 1990). Defendant indicates that she will present persuasive parol evidence indicating that neither she nor Cantrade construed the Letter as a security agreement granting Cantrade a security interest in the Triplex in return for the $1,000,000 Letter of Credit. She argues that contemporaneous written communications with Cantrade will show that the parties only contemplated an increase in the amount of Cantrade's already existing security interest in the Duplex. The Court notes that evidence which is generated, or that concerns events, subsequent to the execution of the Letter, would be admissible even if the Letter were unambiguous. *See Marine Midland Bank–Southern v. Thurlow,* 53 N.Y.2d 381, 387, 442 N.Y.S.2d 417, 419–20 (1981); *Backer v. Lewit,* 180 A.D.2d 134, 584 N.Y.S.2d 480 (1st Dep't 1992).

This Court finds that the Letter is sufficiently ambiguous to preclude a finding, as a

---

6. Cantrade asserts that the full $2,000,000 credit line was extended and consisted of the approximately $1,000,000 due on the Mafra Loan and the $1,000,000 Letter of Credit. *See* Plaintiff Opp. at 15. This Court finds that there are issues of fact concerning whether half of the "envisaged" $2,000,000 line of credit consisted of the Mafra Loan, which was granted in 1984 and which was extended to Mafra and not to Empire Glass.

7. Torresy also argues that Cantrade cannot have a perfected security interest in the Triplex without first having filed a financing statement. *See* Defendant Mem. at 16. Although this is true, it is irrelevant for purposes of the instant motions. A secured creditor need not perfect its interest to have rights superior to the debtor. So long as a security interest has attached, it is enforceable against the debtor.

matter of law, that Torresy intended the Letter to serve as a security agreement. This Court cannot conclude, as a matter of law, that the Letter was a security agreement giving rise to a security interest in the Triplex. Although it appears that Torresy intended the Triplex to secure a further loan of $1 million from Cantrade, this issue is ultimately one of fact which cannot be resolved on the instant motions for summary judgment.

### D. Description of Collateral

■ Cantrade contends that the Letter clearly describes the Triplex as the collateral pledged. It points out that section 9–110 of the UCC states that "any description . . . is sufficient whether or not it is specific if it reasonably identifies what is described."

Torresy argues that the Letter does not contain a legally sufficient description of the collateral as required by UCC 9–203 and 9–110. Torresy observes that Cantrade's own attorneys had to inquire as to the specific apartment numbers of the property purportedly identified in the Letter.

The Court finds Torresy's argument unpersuasive. For the reasons stated below, the collateral is amply identified, and this conclusion is not altered by the fact that some additional research was needed for Cantrade to obtain the precise apartment numbers of the Triplex nor by the fact that the easiest method to determine the apartment numbers was to ask Torresy.

This Court finds that the description of the Triplex contained in the Letter is adequate to meet the section 9–203 requirement that it reasonably identify the collateral. The Letter states that the collateral is (1) a 9,000 square foot property, (2) located at 322 East 57th Street, (3) worth $6,000,000 free and clear of any mortgage, (4) owned by Torresy, and (5) is not a different property worth $1,800,000 located at the same address that

was already held by Cantrade as collateral. Torresy owned only two apartments at the relevant address, and the Duplex was already posted with Cantrade as collateral. Moreover, only the Triplex could, at the time, have been valued at $6,000,000, and only it was 9,000 square feet. It is thus clear that the property discussed in the Letter is the Triplex.

### E. Conclusion

There are material issues of fact concerning whether the Letter was intended to be a security agreement. As a consequence, there are questions of fact about whether or not Cantrade has a security interest in the Triplex. Accordingly, neither Cantrade nor Torresy is entitled to summary judgment on their claims involving the Letter of Credit.[8]

### IV. The Promissory Note

Torresy does not contest her liability on Cantrade's claim for relief under the Promissory Note. Instead she claims that it is possible that the amount of her credit for the sale of the Duplex will exceed the amount of her liability under the Promissory Note. Defendant urges the Court either to refrain from entering judgment or to stay entry of any judgment it might otherwise award Cantrade on the Promissory Note.

This Court has determined that the appropriate credit due Torresy on the sale of the Duplex is the amount for which it was sold minus the debt owed on the Mafra Loan. This amount, with interest, equals a total credit of $99,668. This Court has also found that defendant is not entitled to recover for post-auction subrents that were collected by Cantrade. As a consequence, this Court finds no reason not to award Cantrade the amount clearly due on the Promissory Note, subject only to the set-off amount.

8. Cantrade did not move for summary judgment on the theory that Torresy is liable under her Mafra Guaranty for the Letter of Credit. "In fact, Cantrade assumes for purposes of its summary judgment motion that [Torresy] has not personally guaranteed the Letter of Credit." Plaintiff Opp. at 9. Torresy, however, moved for summary judgment dismissing this particular theory. This Court, having found that summary judgment on the Letter of Credit can not be granted in favor of either party based on the Letter, further finds that the parties' intent as to whether the Letter of Credit should be secured by the Mafra Guaranty also involves questions of fact.

## CONCLUSION

For the reasons stated above, defendant's motion is granted in part and denied in part, and plaintiff's motion is granted in part and denied in part. Specifically, this Court finds for plaintiff on its claim for relief, pursuant to the Promissory Note, but further finds that the amount due must be offset by the extent to which the sale of the Duplex exceeded the amount owed under the Mafra Loan at the time of the sale. Finally, the Court finds that issues of fact exist concerning the Letter of Credit, and consequently, both plaintiff's and defendant's motions are denied to the extent that they seek summary judgment on this issue. The parties are advised to appear in Courtroom 1106 for a pre-trial status conference at 10:30 a.m. on March 31, 1994.

**SO ORDERED.**